UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DUSTIN LEE BARNETTE,
     Plaintiff,

vs.                         Case No.: 3:19cv4743/MCR/EMT

LIEUTENANT P. TUCKER, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on a motion for summary judgment filed by Defendants Tucker, Cade, Cox, and Kinka[1] (ECF No. 42). Plaintiff responded in opposition to the motion (ECF No. 44).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the parties' submissions and the relevant law, the undersigned concludes that Defendants' motion for summary judgment should be granted, and judgment entered in their favor. With respect to Defendant Upton, who is an unserved Defendant, the undersigned recommends that Barnette's claim against

---

[1] Throughout Barnette's pleadings, he refers to Defendant Kinka as "Kuka." The court uses the spelling indicated in defense counsel's notice of appearance (ECF No. 24).

him be dismissed for failure to effect service of process, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

I.    BACKGROUND

Plaintiff Dustin Lee Barnette (Barnette) commenced this case on October 12, 2019, by filing a civil rights complaint under 42 U.S.C. § 1983 (Compl., ECF No. 1).   Presently before the court is Barnette's Second Amended Complaint, which is the operative pleading (Second Am. Compl., ECF No. 12).   Barnette names five Defendants,[2] Lieutenant Preston Tucker, Sergeant Michael Cade, Officer Paul Cox, Officer Mark Kinka, and Officer John Upton (*id.* at 2–3).[3]   Barnette claims that Defendants violated his Eighth Amendment rights by failing to protect him from an attack by another inmate (*id.* at 6–10).[4]   Barnette seeks declaratory relief and compensatory damages (*id.* at 10).   Barnette does not specify whether he is suing Defendants in their official capacities, individual capacities, or both.

Defendants Tucker, Cade, Cox, and Kinka were served with process, and counsel appeared on their behalf.  The court, with the assistance of the United States

---

[2] A sixth Defendant, Nurse Kelly, was previously dismissed from this case (*see* ECF No. 15).

[3] The court refers to each Defendant by the official position he held at the time of the events underlying this action, as indicated in Barnette's Second Amended Complaint.

[4] The court refers to the document numbers and page numbers automatically assigned by the court's electronic filing system.

Marshals Service (USMS) and the Florida Department of Corrections (FDOC), made reasonable efforts to serve Defendant Upton, but those efforts were unsuccessful (*see* ECF Nos. 17, 18, 19, 21, 22, 25, 26, 30).

On March 29, 2021, Defendants Tucker, Cade, Cox, and Kinka filed a motion for summary judgment with supporting evidentiary materials (Defs.' Mot. Summ. J., ECF No. 42; supporting materials, ECF Nos. 42-1 through 42-5).  On April 20, 2021, Barnette filed a response in opposition to Defendants' motion for summary judgment, with supporting evidentiary materials (Pl.'s Resp. to Defs.' Mot. Summ. J. and supporting materials, ECF No. 44).

## II.    APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

To defeat summary judgment, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, 477 U.S. at 324; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate

specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he must prove. *See Celotex Corp.*, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

## B.    Eighth Amendment Standard

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (citing *Farmer* v. Brennan 511 U.S. 825, 832 (1994)). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the

government and its officials are not free to let the state of nature take its course."
*Farmer*, 511 U.S. at 833 (internal quotation marks and citation omitted).  Thus, it
has long been recognized that "prison officials have a duty to protect prisoners from
violence at the hands of other prisoners."  *Id.* (quotation and alteration omitted).
However, "a prison custodian is not the guarantor of a prisoner's safety."  *Purcell v.
Toombs Cnty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quotation omitted).

A prison official violates the Eighth Amendment "when a substantial risk of
serious harm, *of which the official is subjectively aware*, exists and the official does
not respond reasonably to the risk."  *Carter v. Galloway*, 352 F.3d 1346, 1349
(internal quotation marks omitted) (alterations adopted) (emphasis added); *see also
Farmer*, 511 U.S. at 828 ("A prison official's 'deliberate indifference' to a
substantial risk of serious harm to an inmate violates the Eighth Amendment.").  The
three elements of a failure to protect claim are (1) a substantial risk of serious harm;
(2) the defendant's deliberate indifference to that risk; and (3) a causal connection
between the defendant's conduct and the Eighth Amendment violation.  *See Brooks
v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

"When examining the first element—a substantial risk of serious harm—the
court uses an objective standard."  *Caldwell*, 748 F.3d at 1099 (citation omitted).
The alleged condition must be "so extreme that it poses an unreasonable risk of

serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010). Further, there must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. *Brown v. Hughes*, 894 F.2d 1533, 1537 (1990) (quotations omitted).

The second element—deliberate indifference in the context of a failure to prevent harm—has a subjective and an objective component. *See Caldwell*, 748 F.3d at 1099. The subjective component is satisfied by evidence that the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference. *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). The objective component is satisfied by evidence that the official "responded to the known risk in an unreasonable manner, in that he or she knew of ways to reduce the harm but knowingly or recklessly declined to act." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotation marks and citation omitted).

A prisoner may advance an Eighth Amendment claim for failure to protect under two different theories, a "particularized risk" theory or a "dangerous conditions" theory. *See Estate of Owens v. GEO Group, Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016) (unpublished but recognized as persuasive authority). Under

the "particularized risk" theory, which is the theory under which Barnette asserts his Eighth Amendment claim, the prisoner may show that he was the target of a specific threat or danger, and that the defendant was subjectively aware of the individualized danger yet failed to act to alleviate that risk. *See id.* The plaintiff must adduce evidence that the defendant had subjective knowledge of the risk of serious harm to the plaintiff. *See McElligott*, 182 F.3d at 1249–50, 1255.

Constructive knowledge of the risk is insufficient to establish deliberate indifference under the Eighth Amendment. So, where there are multiple defendants who, allegedly, have been deliberately indifferent, "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). The knowledge of one defendant may not be imputed to another. Further, the resulting harm may not be determinative; the essential timeframe under analysis is restricted to the time period before the injury has occurred, when the official had knowledge of the substantial risk of harm but chose to act unreasonably. *See Purcell*, 400 F.3d at 1320 (courts "[can]not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment"); *see also Brooks*, 800 F.3d at 1302 ("The very fact of an injury may, in some circumstances, be a factor in assessing that ex ante risk, but it cannot be sufficient on its own to prove that a substantial risk existed.").

A prison official may escape liability on a deliberate indifference claim if the official shows, for example, that he did not know of the underlying facts indicating a sufficiently substantial danger and was thus unaware of a danger, or that he knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. *See Farmer*, 511 U.S. at 844. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and does not give rise to a constitutional violation. *Id.* at 838.

Finally, the plaintiff must show a causal link between the officer's failure to act reasonably and the plaintiff's injury. *Marbury*, 936 F.3d at 1233 (citation omitted). With respect to causation, section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal quotation marks omitted). The constitutional deprivation must, in turn, be "a legal cause of [the plaintiff's] injuries." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

## III.   MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

The facts pertinent to the resolution of Defendants' motion for summary judgment are drawn from Barnette's verified pleadings (ECF Nos. 1, 9, 12) and the

evidence in the summary judgment record (ECF Nos. 42-1 through 42-5; ECF No. 44). *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding specific facts pled in a sworn complaint must be considered in opposition to a motion for summary judgment). Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the" nonmoving party. *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005). Nevertheless, matters stated by a court as "facts" for purposes of summary judgment may not be the actual facts. *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> . . . .

> **(4) Affidavits or Declarations**.  An affidavit or declaration used to
> support or oppose a motion must be made on personal knowledge, set
> out facts that would be admissible in evidence, and show that the affiant
> or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

If a fact cannot be presented in a form that would be admissible in evidence,

it cannot be used for purposes of summary judgment.  *See Macuba v. Deboer*, 193

F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).  If a party fails to properly

support an assertion of fact or fails to properly address another party's assertion of

fact as required by Rule 56(c), the court will consider the fact undisputed for

purposes of the motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(2).

The events giving rise to Barnette's claims occurred at Santa Rosa

Correctional Institution (Second Am. Compl. at 8–9).  On May 9–10, 2019, Barnette

was housed in a close management cell with Inmate Corey Chaney (Decl. of Preston

Tucker ¶ 3, ECF No. 42-2).  On May 9, 2019, Barnette and Inmate Chaney had six

or seven disagreements, which resulted in more than one physical altercation

(Barnette Dep. 33:1–4, 33:17–22, 36:9–11, 36:15–25, 37:1–5, ECF No. 42-4; Decl.

of Corey Chaney ¶ 3, ECF No. 42-3).  There is a factual dispute as to whether

Barnette or Chaney was the aggressor in the altercations (Barnette Dep. 37:6–25;

Decl. of Corey Chaney ¶ 3).

Close Management Housing Rule 1 requires inmates to conduct themselves in a quiet and orderly manner (Tucker Decl. ¶ 6). Rule 1 does not permit inmates to yell or engage in loud talking or to yell at staff to gain their attention unless there is a true emergency (*id.*). Inmates are required by Close Management Rule 7 to "remain quiet when any staff member enters the wing. When a staff member passes by your cell, you may address staff at that time." (*id.*).

Correctional officers conduct security checks of the close management dormitory every thirty minutes (Tucker Decl. ¶ 7). In the absence of an emergency, correctional officers must complete their security checks to maintain prison operations and security of the correctional institution (*id.*).

FDOC procedure provides that when an inmate presents a signed written statement alleging that he "fears for his . . . safety from other inmates" and that he feels there is no other reasonable alternative open to him, a senior correctional officer (meaning a staff member with the rank of lieutenant or above, *see* Fla. Admin. Code r. 330602.221(j)) must place the inmate in administrative confinement pending review for protective management based on evidence that such a review is necessary and the senior correctional officer determines that no other reasonable alternative is available. *See* Fla. Admin. Code r. 33-602.220(3)(c). Non-supervisory correctional officers do not have unilateral authority to immediately remove an inmate from a

cell who requests protection (Tucker Decl. ¶ 8).  When an inmate requests protection, the claim is reported to the Sergeant who would speak to the inmate to ascertain the allegations and report the incident to the shift supervisor or the dorm lieutenant (*id.*). Ultimately, it is the supervisory official or housing lieutenant who makes the determination to move or place an inmate into protective status (*id.*).  If a determination is made to remove an inmate from a cell, the authorized officers must use restraints, and there must be at least two officers present before a cell door may be opened for security and safety reasons pursuant to Rule 33-601.800(14) (*id.* ¶ 9). A correctional officer may not unilaterally open a cell door to remove an inmate without following security and safety protocol because it would endanger inmates and correctional personnel (*id.*).

On May 10, 2019, the day after the physical altercations between Barnette and Inmate Chaney, Barnette told Officer Upton that there was "an ongoing problem" between him and Inmate Chaney "involving several assaults on my person a day prior," and that he (Barnette) wished to request protection or be placed in a different cell (Am. Compl. at 6, ECF No. 9; Sec. Am. Compl. ¶ 1, ECF No. 12).  Barnette provided this information to Upton "a few minutes prior" to the correctional officers' shift change at 7:00 a.m. (Sec. Am. Compl. ¶ 1).  Officer Upton told Barnette to wait until the next shift of officers came on duty, and Upton left the dormitory (*id.*).

Between 8:55 a.m. and 9:55 a.m.,[5] Lieutenant Tucker, the Shift Supervisor, made "security rounds" in Barnette's dormitory (Am. Compl. at 7; Sec. Am. Compl. ℙ 2; Barnette Dep. 54:2–3; Tucker Decl. ℙ 3). Barnette "tried to make [Tucker] knowledgeable" about the prior assaults by Inmate Chaney, that the problem was ongoing, and that he wanted protection or separation from Chaney, but Tucker did not stop at Barnette's cell and instead "kept on walking by" (Barnette Dep. 54:6–13; Sec. Am. Compl. ℙ 2). Lieutenant Tucker did not hear Barnette request protection or say that he was a victim of prior assaults (Tucker Decl. ℙ 6). If Tucker had heard Barnette, he would have stopped and spoken to him, and then "taken appropriate action" (*id.*). Barnette admits he did not have an opportunity to tell Tucker anything specific about the problem with Chaney (Barnette Dep. 54:14–16).

Barnette told Officer Kinka that Inmate Chaney had previously assaulted him, that he (Barnette) believed that Chaney would continue to assault him if he did not "obey" Chaney, and that he wanted to be separated or protected from Chaney (Sec. Am. Compl. ℙ 5). Officer Kinka told Barnette he "would be back in order to deal with it," but Kinka did not return. (*id.*).

---

[5] Barnette describes this time frame as "within the hour prior to the attack" and alleges "the attack" occurred at approximately 9:55 a.m. (Am. Compl. at 7–8; Sec. Am. Compl. at 8).

Barnette twice told Officer Cox what happened between him and Inmate Chaney the previous day, that he was in fear for this life, that Chaney would continue to assault him unless he "obey[ed] him being that I'm an effeminate gay," and that he wanted to request protection from Chaney or to be moved to another cell (Barnette Dep. 55:3–15; Sec. Am. Compl. ₽ 4). Barnette states he told Officer Cox about this once at the front door of the cell and again while Cox was escorting a nurse during her medication rounds in the dormitory (Sec. Am. Compl. ₽ 4). Officer Cox responded that he would contact the sergeant (Barnette Dep. 55:3–6, 55:16–18).

Nursing staff are required to be escorted by a correctional officer when dispensing medication for security reasons (Tucker Decl. ₽ 7). An officer escorting a nurse must remain with the nurse to maintain security and protection of nursing staff (*id.*). Any requests for protection by inmates made during this time would be reported to supervisory personnel for further investigation (*id.*).

Barnette told Sergeant Cade, twice at the front door of his cell, that he had been attacked and assaulted by Inmate Chaney several times the previous day, that the problem was ongoing, that he (Barnette) was in fear for his life, and that he needed protection or to be placed in another cell (Sec. Am. Compl. ₽ 3). Barnette told Sergeant Cade the same thing a third time, at the back window of the cell, and

Barnette also told Cade that he needed his injuries from the prior attacks assessed by medical staff, but Sergeant Cade responded that he "did not deem it necessary" (*id.*).

At 9:55 a.m., Lieutenant Tucker conducted daily rounds in Barnette's dormitory (Tucker Decl. ℙ 3). Tucker stopped at Barnette's cell and observed Barnette near the cell door bleeding from his face (*id.* ℙℙ 3–4). Tucker observed Inmate Chaney near the back of the cell with blood on his fists (*id.* ℙ 4). Lieutenant Tucker questioned both inmates, and they both admitted to being involved in a physical altercation but would not provide a reason for why they were fighting (*id.*). Lieutenant Tucker subsequently issued both inmates a disciplinary report for fighting (*id.*).

Barnette was escorted to the medical department for evaluation and treatment of his injuries (Tucker Decl. ℙ 5; Decl. of Kellie Caswell, RN, BSN ℙℙ 9–11, ECF No. 42-5). According to Barnette's medical records, an Advanced Practice Registered Nurse evaluated Barnette at 10:07 a.m. (Caswell Decl. ℙ 9; FDOC Emergency Room Record and FDOC Chronological Record of Health Care (medical records), ECF No. 42-5 at 4–5). Barnette arrived in the medical department ambulatory, alert and oriented x 4, and was verbally responding to questions (Caswell Decl. ℙ 9; medical records). Barnette's pupils were Equal Round, and Reactive to Light (PERRL), nares patent, extraocular movements (EOM) intact,

normocephalic, and lungs clear to auscultation bilaterally (*id.*). Barnette's heart sounds were normal with a regular rate and rhythm (*id.*). Barnette's abdomen was soft and flat with bowel sounds present (*id.*). During the physical examination, Barnette complained of pain to his facial area (Caswell Decl. ⁋ 10; medical records). Barnette had two lacerations: a 2.5 cm horizontal laceration to his right cheek, under his eye, and an unapproximated 1 x 2 cm laceration to his left eyebrow (*id.*). In addition to the lacerations, Barnette had purple bruising and mild swelling to his right eye and swelling to the bridge of his nose (*id.*). The ARNP cleaned the laceration to Barnette's right cheek and applied Dermabond skin adhesive to the laceration (Caswell Decl. ⁋ 11; medical records). The ARNP cleaned Barnette's left eyebrow and applied three sutures with minimal bleeding (*id.*). Barnette tolerated the procedure well and was educated to keep the site clean and avoid scratching, picking, or pulling the sutures (*id.*). The ARNP instructed Barnette to follow up with nursing staff in 7–10 days for suture removal (*id.*). Barnette was discharged back to confinement and educated to use sick call procedures for any additional medical concerns (*id.*).

On May 30, 2019, Barnette was seen by medical staff for removal of the three sutures (Caswell Decl. ⁋ 12; medical records). Barnette tolerated the removal well

(*id.*).  There were no signs or symptoms of infection, and the laceration was healed with no documentation of scarring noted (*id.*).

Based upon Ms. Caswell's knowledge and experience as a nurse, it is her opinion that the type of laceration sustained by Barnette is not a serious injury, and such lacerations heal well with proper treatment, care, and follow-up (Caswell Decl. ¶ 14).  Additionally, in Caswell's nursing opinion, mild swelling and bruising is not a serious injury, and the type of bruising and mild swelling that Barnette suffered typically resolves on its own and heals well with proper treatment, care, and follow-up (*id.*).

## IV.  DEFENDANTS TUCKER, CADE, COX, AND KINKA ARE ENTITLED TO QUALIFIED IMMUNITY ON BARNETTE'S CLAIMS FOR MONETARY DAMAGES AGAINST THEM IN THEIR INDIVIDUAL CAPACITIES

Defendants contend they are entitled to qualified immunity on Barnette's individual capacity claims for monetary damages because none of the Defendants violated Barnette's clearly established constitutional rights (Defs.' Mot. Summ. J. at 27–31, ECF No. 42).  Barnette contends Defendants are not entitled to qualified immunity (Pl.'s Resp. to Defs.' Mot. Summ. J. at 3–4, ECF No. 44).

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless

their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To receive qualified immunity, a defendant must first prove that he or she was acting within the scope of his or her discretionary authority when the relevant conduct took place. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Once that is shown, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Id.*

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *See Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 659 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), but to survive a qualified immunity defense, the plaintiff must satisfy both showings, *see Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently

clear' that *every* 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).  This imposes an objective standard, and that objective standard is "measured by reference to clearly established law."  *Harlow*, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court should determine if the law was clearly established at the time the incident occurred.  As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful . . . .  If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow*, 457 U.S. at 818–19.  If the law is not clearly established, then the court should dismiss the case against the government official.  If the law was clearly established, then the claim against the government official should go forward.

Recognizing that the clearly established law question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Supreme Court does not require a case directly on point,

but "existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation.  *See Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted).  To be clearly established, the precedent must give officials clear warning of unconstitutional conduct.  *Id.*

In considering the law to conduct this analysis, the district court should compare the facts of the case before it with the facts of those cases that the non-moving party contends show the clearly established nature of the law.  As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.  Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—not clearly established when the defendant acted.

*Merricks*, 785 F.3d at 559 (internal quotation marks omitted).

Case No.:  3:19cv4743/MCR/EMT

In one of its fairly recent opinions, the Supreme Court observed:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (multiple citations, some quotation marks, and alterations omitted).

The court cannot consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

And finally, because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)

(citation omitted), each defendant is entitled to an independent qualified immunity analysis as it relates to his or her actions and omissions. "So [the court] must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

Here, Barnette does not dispute that Defendants were acting within the scope of their discretionary authority as FDOC correctional officers when the alleged constitutional violation occurred. Further, Defendants have shown objective circumstances which compel the conclusion that their actions were undertaken pursuant to the performance of their duties and within the scope of their authority. The undisputed facts show that at the time of each Defendant's interaction with Barnette, the Defendant was performing a function within his job description as a correctional officer. Additionally, each Defendant was performing his function through means within his power to utilize. Therefore, the court is satisfied that each Defendant's actions were within the scope of his discretionary authority. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (holding that in order to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job

description; and at the second step, the court asks whether the government employee was performing the job-related function "through means that were within his power to utilize.").

The burden thus shifts to Barnette to show that qualified immunity is not appropriate. Barnette must show that the Defendant's conduct violated a federal right. *See Tolan*, 572 U.S. at 659. And Barnette must also show that the right in question was clearly established by binding precedent at the time of the violation. *Id.*

Barnette cites only one case which qualifies as binding precedent for purposes of qualified immunity in this case, *Farmer v. Brennan*, 511 U.S. 825 (1994) (Pl.'s Resp. to Defs.' Mot. for Summ. J., ECF No. 44 at 3–4).[6] In *Farmer*, the Supreme

---

[6] Barnette also cites *Smith v. Wade*, 461 U.S. 30 (1983). However, *Smith* did not address the issue of a defendant's immunity from liability on a failure to protect claim, instead, it dealt solely with the issue of damages, specifically, the proper standard for awarding punitive damages after a jury had determined the issue of liability. *See Smith*, 461 U.S. at 33–34. Therefore, *Smith* is not applicable in determining whether Defendants are entitled to qualified immunity.

The other Supreme Court decisions cited by Barnette address qualified immunity in other contexts. *See Saucier v. Katz*, 533 U.S. 194 (2001) (addressing qualified immunity with respect to an excessive force claim); *Mulleniz v. Luna*, 577 U.S. 7 (2015) (same); *Reibhle v. Howards*, 566 U.S. 658 (2012) (addressing qualified immunity with respect to a First Amendment retaliation claim and a Fourth Amendment search and seizure claim). Barnette also cites two Eleventh Circuit decisions, but both of them address qualified immunity in a different context. *See Burnette v. Taylor*, 533 F.3d 1325 (11th Cir. 2008) (addressing qualified immunity with respect to a medical indifference claim); *McCullough v. Antolini*, 559 F.3d 1201 (2009) (addressing qualified immunity with respect to an excessive force claim). Barnette also cites an Eighth Circuit case, but that case does not qualify as binding precedent for the qualified immunity analysis in this case.

Court held that the proper test for deliberate indifference, in the context of an Eighth

Amendment failure to protect claim, is the following:

> a prison official cannot be found liable under the Eighth Amendment
> for denying an inmate humane conditions of confinement unless the
> official knows of and disregards an excessive risk to inmate health or
> safety; the official must both be aware of facts from which the inference
> could be drawn that a substantial risk of serious harm exists, and he
> must also draw the inference.

511 U.S. at 837. *Farmer* involved a transsexual prisoner who claimed that prison

officials showed deliberate indifference to his safety from harm from other inmates

by placing him in the general prison population.  The Supreme Court vacated the

district court's grant of summary judgment in favor of the prison officials and

remanded for further proceedings, because the district court "may have mistakenly

thought" that the plaintiff was required to provide a defendant with advance

notification of a risk of harm.  *Id.* at 849.  The Court noted that advance notification

was not a necessary element of a failure to protect claim, and that subjective

knowledge may be inferred from other evidence in the summary judgment record,

such as (1) prison officials' admission that Farmer was a "non-violent" transsexual

who, because of his "youth and feminine appearance," was "likely to experience a

great deal of sexual pressure" in prison; and (2) a defendant's statement to Farmer

that there was "a high probability" Farmer "could not safely function" at the prison. *Id.*

Although *Farmer* is the only relevant case Barnette cited, the court will summarize the other cases which qualify as binding precedent at the time of Defendants' conduct, May 10, 2019.

In the Eleventh Circuit's 2016 decision in *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), the court held that the defendants' total failure to investigate or take any other action to mitigate the substantial risk of serious harm that Bowen's cellmate posed to Bowen was unconstitutional where the facts showed that the defendants knew the following: (1) the cellmate had been convicted of murder; (2) the cellmate was a severe paranoid schizophrenic who suffered from auditory hallucinations and violent delusions involving his cellmates; (3) the cellmate could become impulsive and dangerous if his mental condition decompensated; (4) the cellmate was designated by the prison as a Level III mental health inmate, meaning he exhibited "a tenuous mental status that is easily overwhelmed by everyday pressures, demands and frustrations resulting in . . . impulsive behavior, poor judgment, a deterioration of emotional controls, loosening of associations, delusional thinking and/or hallucinations"; (5) the cellmate had been transferred to the segregation unit for assaulting his previous cellmate; (6) the

prison's "Placement Guideline[s]" required mental health inmates who had committed an assault to be housed alone; (7) Bowen was being housed in the cell with the cellmate in contradiction to the Guidelines' requirement; (8) the cellmate was significantly larger than Bowen; and (9) the cell the two inmates shared was small, not observable from the outside unless the window flap was lifted, and not equipped with an alarm. *Id.* at 1321–25.

In the Eleventh Circuit's 2014 decision in *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014), the court held that the defendants' total failure to make any attempt, or take any action, to minimize the substantial risk of serious harm that Caldwell's cellmate posed to him was unconstitutional where the facts showed that the defendants knew the following:

> • During his incarceration at another federal prison, [the cellmate] was very disruptive and had a violent past that resulted in his placement in the SMU [Special Management Unit]. [The cellmate] required greater prison management at the SMU to ensure the safety, security, and orderly operation of federal prisons.

> • On the morning of September 9, 2009, while [the cellmate] and plaintiff Caldwell were locked in their shared cell, [the cellmate] started a fire in the cell. Caldwell played no part in starting that fire, and [the cellmate] quickly and freely claimed full responsibility for starting the fire.

> • [The cellmate] used Caldwell's personal photographs and papers when starting the fire.

• While the inmates remained in the locked cell, the fire filled the cell with flames and black smoke. Although the fire was concentrated at the door, it had also spread to (or from) the cell's light fixture, sink, and plaintiff Caldwell's personal property.

• The fire was so severe that the flames and firefighting efforts destroyed a large amount of Caldwell's personal property, including his personal photographs, address book, and legal materials.

• After being rescued from his locked, fiery cell, plaintiff Caldwell needed a medical examination to assess his injuries.

• The cell fire threatened plaintiff Caldwell's and [the cellmate's] lives and/or safety.

• After the fire but before he was returned his cell, plaintiff Caldwell told each defendant that he feared that his life would be in danger if he was returned to the cell with [the cellmate]. . . . [O]n September 10 . . ., the morning after the fire, . . . [the cellmate] placed Caldwell in a choke-hold until Caldwell passed out. When Caldwell regained consciousness, he discovered that he was on the floor and that his hands and feet were bound with fabric. Caldwell was bleeding from his nose and from a gash on his head. [His cellmate] held an 8.5 shank, with a handle made from cloth, and yelled through the cell door that he was going to kill Caldwell. . . . Caldwell had puncture wounds and cuts on his head and chest; contusions on his scalp, forehead, nose, cheek, and neck; lacerations on his chest; and abrasions to his wrists, ankles, left knee, and right shin.

• Following [the cellmate's] attack on plaintiff Caldwell, Captain Smith [Smith was not a named Defendant] stated in a report that [the cellmate] "was very disruptive" and had "an extensive well documented history of disruptive and assaultive behavior" that was having "a major impact on the orderly running of the Institution as well as the safety of both Staff and inmates."

748 F.3d at 1100–01.

In the Eleventh Circuit's 2007 decision in *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007), the plaintiff had been segregated from the general prison population for security purposes, during which time he received (and reported to prison authorities) specific death threats from members of his former gang who were prisoners in the general population. *Id.* at 613–15. Rodriguez's requests for a transfer to another facility were denied. Within hours of his release into the general prison population, a member of his former gang stabbed him in the chest and back. *Id.* at 615–16. The Eleventh Circuit found that "the gang-related threats made on Rodriguez's life, which were explicitly reported to prison officials, present[ed] a substantial enough risk of harm to trigger a prison official's Eighth Amendment duty to act." *Id.* at 617 n.12.

In the Eleventh Circuit's 2003 decision in *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), the court held that "the total failure to monitor or supervise a visibly violent, mentally unstable, schizophrenic inmate who was housed in a separate unit for mentally ill inmates and who posed a substantial risk of serious harm to other inmates in that housing unit constituted deliberate indifference" in violation of the Eighth Amendment. *Id.* at 1358–59.

Against this legal backdrop, the court will judge each individual Defendant's conduct. *See Burnette*, 533 F.3d at 1331 (where there are multiple defendants who,

allegedly, have been deliberately indifferent, each individual defendant must be judged separately and on the basis of what that person knows).

### A.      Defendant Lieutenant Tucker

According to Barnette, he "tried to make [Lieutenant Tucker] knowledgeable" about the prior assaults by Inmate Chaney, that the problem was ongoing, and that he wanted protection or separation from Chaney (Barnette Dep. 54:6–13), but Tucker did not stop at the cell and instead kept walking.  Barnette admits he did not have an opportunity to tell Lieutenant Tucker anything specific about the problem with Chaney.  Lieutenant Tucker states he did not hear Barnette request protection or say that he was a victim of prior assaults, and if he had heard this from Barnette, he would have stopped and spoken to him, and then taken appropriate action.

Viewing the evidence the light most favorable to Barnette, he cannot establish that Lieutenant Tucker subjectively knew of a substantial risk of serious harm. Because Barnette has not met his burden of showing that Lieutenant Tucker violated his Eighth Amendment rights, Tucker is entitled to qualified immunity on Barnette's claim.

### B.      Defendant Officer Kinka

The summary judgment evidence shows that Barnette told Officer Kinka that Inmate Chaney had assaulted him the day before, that Barnette believed that Chaney

would continue to assault him if he did not "obey" Chaney, and that Barnette wanted to be separated or protected from Chaney.[7]  Officer Kinka responded to Barnette's request for protection by telling him that he "would be back in order to deal with it." Officer Kinka did not return prior to the time Inmate Chaney attacked Barnette.

There is no evidence that Kinka's failure to return was due to deliberate indifference, as opposed to mere negligence.  Further, considering the fact that FDOC policy did not permit Officer Kinka to immediately remove Barnette from the cell and instead required Kinka to complete his security check (absent emergency circumstances, of which there is no evidence in this case[8]) and then report Barnette's claim to the Sergeant on duty, Officer Kinka's response to Barnette's request for protection was objectively reasonable.

The facts, viewed in the light most favorable to Barnette, do not show that Officer Kinka acted with deliberate indifference.  Because Barnette has not met his

---

[7] In Barnette's Complaint and Amended Complaint, he alleges he "made [each Defendant] knowledgeable that there was a substantial risk I would be seriously harmed" by Inmate Chaney (*see* Compl. at 4–7; Am. Compl. at 6–9).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).  And "bare assertions" that "amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Id.* at 681 (quotation marks and citation omitted).

[8] For example, there is no evidence that Barnette had any visible injuries from the previous assaults, or that there were other circumstances suggesting that Barnette required immediate protection in order to avoid serious harm.

Case No.:  3:19cv4743/MCR/EMT

burden under the first step of the qualified immunity analysis, Officer Kinka is entitled to qualified immunity on Barnette's Eighth Amendment claim.

### C.    Defendant Officer Cox

The summary judgment evidence shows that Barnette told Officer Cox that Inmate Chaney had assaulted him the day before, that he believed that Chaney would continue to assault him if he did not "obey" Chaney, that he feared for his life, and that he wanted to request protection or be separated from Chaney.   Officer Cox responded that he would report this information to the duty Sergeant.

Under established FDOC procedures, this was the proper protocol for Officer Cox to follow in response to an inmate's request for protection (as previously discussed, FDOC policy requires an officer to report the inmate's claim to the Sergeant, who then must speak to the inmate to ascertain the allegations, and then report the incident to the shift supervisor or the dorm lieutenant).   There is no evidence that Officer Cox failed to report Barnette's claim.   And even if Officer Cox failed to report it, there is no evidence that Cox did so deliberately, as opposed to negligently.

The facts, viewed in the light most favorable to Barnette, do not show that Officer Cox acted with deliberate indifference.   Because Barnette has not met his

burden under the first step of the qualified immunity analysis, Officer Cox is entitled to qualified immunity on Barnette's Eighth Amendment claim.

### D.    Defendant Sergeant Cade

The summary judgment evidence shows that Barnette told Sergeant Cade three times that he had been attacked and assaulted by Inmate Chaney several times the previous day, that the problem was ongoing, that he was in fear for his life, and that he needed protection or to be placed in another cell.  Sergeant Cade responded that he "did not deem it necessary."

As Eleventh Circuit caselaw establishes, officials must possess enough details about a threat to enable them to conclude that it presents a "strong likelihood" of injury, not a "mere possibility."  *See Brooks*, 800 F.3d at 1301; *Brown*, 894 F.2d at 1537.  A prison official may escape liability on a deliberate indifference claim if the official did not know of the underlying facts indicating a sufficiently substantial danger, or *if he knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.  See Farmer*, 511 U.S. at 844 (emphasis added).  "The unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm."  *Marbury*, 936 F.3d at 1236 (internal quotation mark and citation omitted).  "[A]n official's failure to alleviate a

significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and does not give rise to a constitutional violation. *Id.* at 838. Although the court cannot condone the failure to investigate an inmate's allegations of threats or to follow policy in reporting potential threats up the chain of command, Eleventh Circuit caselaw "does not allow these failure, without corresponding subjective awareness of a serious risk of harm, to establish deliberate indifference." *Id.* at 1238.

Even if Sergeant Cade *should have* perceived that there was a substantial risk Inmate Chaney would attack Barnette, the undisputed evidence shows that Sergeant Cade subjectively believed that the risk was insubstantial or nonexistent. Viewing the facts in the light most favorable to Barnette, he has not demonstrated a genuine factual issue as to whether Sergeant Cade subjectively knew that Barnette faced a substantial risk of serious harm from Inmate Chaney. Therefore, Sergeant Cade is entitled to qualified immunity on the first prong of the qualified immunity analysis.

Moreover, even if the court determined that Sergeant Cade violated Barnette's Eighth Amendment rights, the court must nevertheless conclude that Cade is entitled to qualified immunity on the "clearly established right" prong of the qualified immunity analysis. As previously discussed, this analysis requires the court to examine binding precedent as it existed on May 10, 2019, and then determine

whether *every reasonable officer in Sergeant Cade's situation* would have understood that his failure to separate Barnette and Inmate Chaney violated Barnette's Eight Amendment right.  Keeping in mind the Supreme Court's admonishment that the clearly established law, for qualified immunity purposes, must be "particularized to the facts of the case," *see White*, 137 S. Ct. at 552, and considering the facts of *Farmer* and the Eleventh Circuit cases discussed *supra*, the undersigned cannot conclude that the facts of any of those cases were sufficiently similar to the facts of this case to put Sergeant Cade on clear notice that his failure to separate Barnette and Chaney violated the Eighth Amendment.

The case with the closest set of facts is *Rodriguez*, but in that case, the plaintiff had been segregated from the general prison population *for security reasons*, and he notified the defendants of *specific death threats from members of his former gang*. 508 F.3d at 613–15.  The Eleventh Circuit held that "the gang-related threats made on Rodriguez's life . . . present[ed] a substantial enough risk of harm" to trigger a prison official's Eighth Amendment duty.  *Id.* at 617 n.12.  Here, although Barnette told Sergeant Cade that he feared for his life, Barnette did not report any specific threats from Chaney, let alone a death threat, or that Chaney had resumed the assaults from the previous day.  Further, there is no evidence that Barnette provided Sergeant Cade with any details of the previous day's "attacks" and "assaults" or the "ongoing

problems" such that Cade was put on notice that Barnette could suffer serious harm

if he was not separated from Chaney.  The specific circumstances facing Sergeant

Cade were not enough like the facts in *Rodriguez* to put every reasonable, similarly

situated officer on notice that he had a constitutional duty to separate Barnette from

Chaney.  Therefore, Barnette has not satisfied his burden under the second prong of

the qualified immunity analysis.[9]

　　　To summarize, Barnette has failed to carry his burden of demonstrating that

Defendants Tucker, Cade, Cox, and Kinka are not entitled to qualified immunity on

---

[9] Another Eleventh Circuit case is worth mention.  In *Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003), the Eleventh Circuit held that the plaintiff failed to establish that defendants had a subjective awareness of a substantial risk of serious physical threat to him from his cellmate, where prison officials knew that the cellmate was a "problem inmate" with a well-documented history of prison disobedience and had been prone to violence, and the plaintiff had complained that the cellmate was acting crazy, roaming his cell like a "caged animal," wanting to fake a hanging, and telling plaintiff he would help in the fake hanging "one way or another," but the plaintiff never told any defendant he feared his cellmate or that his cellmate had clearly threatened him.  352 F.3d at 1349–50.  The court *noted in dictum* that a plaintiff's telling prison officials he feared his would-be attacker, telling defendants that his would-be attacker clearly threatened him, and requesting placement in protective custody *may* provide a sufficient basis to satisfy the subjective component of the deliberate indifferent standard, *see* 352 F.3d at 1349–50.  However, *dicta* are not clearly established law for purposes of qualified immunity analysis.  *See Denno v. School Bd. Of Volusia Cnty., Fla.*, 218 F.3d 1267, 1280 (11th Cir. 2000) ("It is well established in this circuit, however, that *dicta* are of no assistance in determining whether or not law is clearly established for the purpose of qualified immunity.") (citing *Jones v. Cannon*, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999), and *Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir. 1996)).

　　　Additionally, there is no evidence that Barnette notified Sergeant Cade that Inmate Chaney had clearly threatened to resume the previous days attacks, or that Chaney was known to be a "problem inmate" like the inmate in *Carter*.

Barnette's individual capacity claims for monetary damages. Therefore, Defendants are entitled to summary judgment in their favor as to those claims.

## V.    DEFENDANTS ARE ENTITLED TO IMMUNITY ON BARNETTE'S CLAIMS FOR MONETARY DAMAGES AGAINST THEM IN THEIR OFFICIAL CAPACITIES

To the extent Barnette seeks monetary damages against Defendants in their official capacities, those claims are barred by the Eleventh Amendment. The Eleventh Amendment is an absolute bar to suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment bars a § 1983 plaintiff's claims for monetary damages against individual employees of the Florida Department of Corrections in their official capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65, 71 (1989) (holding that the Eleventh Amendment bars a section 1983 suit against a State and state officials in their official capacities); *McKinley v. Kaplan*, 177 F.3d 1253, 1256 (11th Cir. 1999) (Section 1983 does not create a cause of action for money damages against the States, a State agency, or State officials in their official capacities). Therefore, Defendants are entitled to summary judgment

on Barnette's official capacity claims for monetary damages against them in their official capacities.

## VI.    BARNETTE'S REQUEST FOR DECLARATORY RELIEF

Barnette requests a declaration that Defendants' failure to protect him from Inmate Chaney violated his constitutional rights (Sec. Am. Compl. at 10).   As discussed *supra* in the court's discussion of qualified immunity, the facts, viewed in the light most favorable to Barnette, do not show that any Defendant violated Barnette's Eighth Amendment rights.   Therefore, he is not entitled to any relief, including declaratory relief, on his Eighth Amendment claims.

Additionally, it appears that Barnette's request for declaratory relief has been rendered moot by the fact that he and Inmate Chaney are no longer housed at the same institution.   A claim for declaratory relief that no longer presents a case or controversy must be dismissed as moot.   *See Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (holding that inmate's claims for declaratory and injunctive relief relating to conditions of confinement at a particular institution are rendered moot by the inmate's transfer from that institution, because the claims no longer present a case or controversy); *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985).

According to Inmate Chaney's declaration, submitted by Defendants in support of their summary judgment motion, Chaney's FDOC inmate number is

T79314 (Decl. of Corey Chaney ⁋ 2, ECF No. 42-3).  The court takes judicial notice

of information available on the Corrections Offender Network of the FDOC's public

website, which indicates that Inmate Chaney's current location is the Northwest

Florida Reception Center, and he is scheduled to be released from the FDOC in a

few months.  *See* www.dc.state.fl.us (follow "Offender Search" hyperlink; then

follow "Inmate Population Information Search" hyperlink; then search "DC

Number" field for "T79314").  Barnette is still housed at Santa Rosa C.I.  Because

Barnette is no longer exposed to the allegedly unconstitutional condition, and there

is no evidence of a substantial likelihood that he and Chaney will be housed at the

same institution in the future, Barnette's claim for declaratory relief is moot.

## VII.   BARNETTE'S CLAIM AGAINST DEFENDANT UPTON

Barnette's Second Amended Complaint asserts an Eighth Amendment claim

against Defendant Officer John Upton (Second Am. Compl. ⁋ 1).  On June 2, 2020,

the court directed the USMS to serve Barnette's Second Amended Complaint upon

Defendants, including Upton (ECF No. 17).  On June 23, 2020, the USMS notified

the court that its efforts to serve Defendant Upton at Santa Rosa C.I. were

unsuccessful, because the special process server at that institution stated that Upton

no longer worked there (ECF No. 19).  The court enlisted the assistance of the FDOC

to determine Defendant Upton's last known address (ECF No. 21).  The FDOC

notified the court that it provided Defendant Upton's last known address to the USMS in confidence (ECF No. 25).   The court directed the USMS to serve Defendant Upton at the address provided by the FDOC (ECF No. 26).  On September 9, 2020, the USMS filed a return of service certifying that Defendant Upton was unable to be located (ECF No. 30).   The USMS stated that the residence at the confidential address provided by the FDOC appeared vacant, and the mailbox was destroyed (*id.*).   The USMS stated that it checked the State of Florida's driver's license system for Defendant Upton's address, but it returned the same address provided by the FDOC (*id.*).

Under Rule 4(m) of the Federal Rules of Civil Procedure, the court "must dismiss the action without prejudice . . . or order that service be made within a specified time" if a defendant is not served within ninety days after the complaint was filed.  Fed. R. Civ. P. 4(m).  If a plaintiff shows "good cause" for the failure to serve within ninety days, the court "must extend the time for service for an appropriate period."  *Id.*

A plaintiff proceeding IFP under § 1915 is entitled to have the clerk of court and the USMS effect service of process upon defendants.  *See* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(3); *Bilal v. Geo Care, LLC*, 981 F.3d 903, 919 (11th Cir. 2020). "[T]he failure of the United States Marshal to effectuate service on behalf of an in

forma pauperis plaintiff through no fault of that plaintiff constitutes 'good cause' for the plaintiff's failure to effect timely service within the meaning of Rule 4(m)." *Rance v. Rocksolid Granit USA, Inc.*, 583 F.3d 1284, 1288 (11th Cir. 2009). Further, the Eleventh Circuit has said that it is unreasonable to expect prisoners proceeding pro se to provide the current addresses of prison-guard defendants who no longer work at a prison. *Richardson*, 598 F.3d at 739–40 (citing *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990)). Thus, so long as the USMS can locate the defendant with "reasonable effort," a plaintiff establishes "good cause" under Rule 4(m) by providing enough information to identify the prison-guard defendant. *Id.* at 740.

Even when a plaintiff cannot demonstrate "good cause," the district court "must still consider whether any other circumstances warrant an extension of time based on the facts of the case." *Bilal*, 903 F.3d at 919 (internal quotation marks and citation omitted). For example, the Eleventh Circuit has explained that where the statute of limitations would preclude refiling, the Advisory Committee Note to Rule 4(m) suggests that an extension might be appropriate. *Id.* (internal quotation marks and citation omitted). So a district court may exercise its discretion to dismiss the case without prejudice or to direct service to be accomplished within a set time only

after it evaluates any factors that may bear on this determination. *Id.* (citation omitted).

Here, more than ninety days has passed since the court directed service of Barnette's Second Amended Complaint, on June 2, 2020. Defendant Upton has not been served with process despite reasonable efforts by the court and the USMS to locate him. Extending the time to effect service of process would be futile as there appears to be no other known avenue to discover Defendant Upton's whereabouts. Further, the statute of limitations will not preclude Barnette from refiling his § 1983 claim if he is able to locate Defendant Upton through his own efforts.[10] Therefore, Barnette's claim against Defendant Upton should be dismissed without prejudice, pursuant to Rule 4(m).

VIII. CONCLUSION

Defendants Tucker, Cade, Cox, and Kinka are entitled to qualified immunity on Barnette's claims for monetary damages against them in their individual capacities. Barnette's claims for monetary damages against Defendants in their official capacities are barred by the Eleventh Amendment. Barnette's request for

[10] The statute of limitations for § 1983 claims is four years. Defendant Upton's alleged conduct occurred on May 10, 2019; therefore, it appears that the statute of limitations does not expire for another two years.

declaratory relief should be denied because the facts to not establish an Eighth Amendment violation as to any Defendant, and Barnette's request is moot considering the fact that he and Inmate Chaney are no longer housed at the same institution. For these reasons, Defendants Tucker, Cade, Cox, and Kinka are entitled to summary judgment in their favor. Barnette's claim against Defendant Upton should be dismissed without prejudice for failure to effect service of process, pursuant to Fed. R. Civ. P. 4(m).

Accordingly, it is respectfully **RECOMMENDED** that:

1.    The motion for summary judgment filed by Defendants Tucker, Cade, Cox, and Kinka (ECF No. 42) be **GRANTED** and judgment entered in their favor.

2.    Plaintiff's claims against Defendant Upton be **DISMISSED without prejudice** for failure to effect service of process, pursuant to Fed. R. Civ. P. 4(m).

3.    The clerk of court be directed to enter judgment accordingly and close this case.

At Pensacola, Florida this 20th day of May 2021.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**